UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANTOINE L. ARDDS,

        Plaintiff,

    v.

V. KIEU, C. LUNDGREN AND J. LEVIN,

        Defendants.[1]

No.  2:20-cv-0133 TLN CSK P

ORDER AND FINDINGS AND RECOMMENDATIONS

## I. INTRODUCTION

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the Court is defendants' motion for summary judgment as to the second amended complaint (ECF No. 77), plaintiff's motion for appointment of counsel (ECF No. 79) and defendants' motion to strike plaintiff's sur-reply.  (ECF No. 87.)  This action proceeds on plaintiff's second amended complaint for Eighth Amendment claims against defendants Staff Psychologist and plaintiff's Mental Health Primary Clinician ("MHPC") Kieu, California Health Care Facility ("CHCF") Rehabilitation Therapist Lundgren and Social Worker Levin, all members of the Interdisciplinary Treatment Team ("IDTT"), for their conduct between

---

[1]  The Clerk of the Court is directed to update the caption of this action to remove defendant Martin, who has been dismissed.

1

1    August 27, 2019 and September 11, 2019.  (ECF Nos. 48, 49.)

2       For the following reasons, this Court recommends that defendants' summary judgment

3    motion be granted.  For the following reasons, plaintiff's motion for appointment of counsel is

4    denied and defendants' motion to strike plaintiff's sur-reply is granted.

5    **II. LEGAL STANDARDS FOR SUMMARY JUDGMENT**

6       Summary judgment is appropriate when it is demonstrated that the standard set forth in

7    Federal Rule of Civil Procedure 56 is met.  "The court shall grant summary judgment if the

8    movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

9    judgment as a matter of law."  Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears
> the initial responsibility of informing the district court of the basis
> for its motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

14    Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.

15    56(c)).  "Where the nonmoving party bears the burden of proof at trial, the moving party need

16    only prove that there is an absence of evidence to support the non-moving party's case."  Nursing

17    Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.), 627 F.3d 376,

18    387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P. 56 advisory

19    committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

20    burden of production may rely on a showing that a party who does have the trial burden cannot

21    produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

22    should be entered, after adequate time for discovery and upon motion, against a party who fails to

23    make a showing sufficient to establish the existence of an element essential to that party's case,

24    and on which that party will bear the burden of proof at trial.  Celotex Corp., 477 U.S. at 322.

25    "[A] complete failure of proof concerning an essential element of the nonmoving party's case

26    necessarily renders all other facts immaterial."  Id. at 323.

27       Consequently, if the moving party meets its initial responsibility, the burden then shifts to

28    the opposing party to establish that a genuine issue as to any material fact actually exists.  See

1    Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

2    establish the existence of such a factual dispute, the opposing party may not rely upon the

3    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

4    form of affidavits, and/or admissible discovery material in support of its contention that such a

5    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

6    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

7    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

8    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

9    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

10   a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

11   (9th Cir. 1987), overruled on other grounds as stated in Flood v. Miller, 35 F. App'x 701, 703 n.3

12   (9th Cir. 2002).

13         In the endeavor to establish the existence of a factual dispute, the opposing party need not

14   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

15   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

16   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

17   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

18   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's notes to 1963

19   amendments).

20         In resolving a summary judgment motion, the court examines the pleadings, depositions,

21   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

22   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

23   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

24   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

25   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

26   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

27   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

28   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

By order and notice filed May 22, 2023 and March 22, 2024 (ECF Nos. 59, 77-1), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

**III. BACKGROUND**

On April 15, 2021, the Court ordered service of plaintiff's first amended complaint (ECF No. 15) as to the following claims: 1) between August 27, 2019 and November 26, 2019, defendants Lewis, Martel, Martin, Eldridge and Kieu were deliberately indifferent to plaintiff's serious mental health needs, and failed to protect plaintiff from a substantial risk of harm, in violation of the Eighth Amendment; 2) between August 27, 2019 and November 26, 2019, defendants Lewis, Martel, Martin, Eldridge and Kieu retaliated against plaintiff in violation of the First Amendment by removing plaintiff from necessary mental health care because plaintiff initiated and maintained misconduct complaints; 3) on September 6, 2019, defendant Lewis retaliated against plaintiff for filing civil actions and staff complaints by revealing privileged information to incite an inmate attack on plaintiff; and 4) state law negligent failure to protect claims against defendants Martel, Martin and Eldridge.  (ECF No. 18.)

On October 22, 2021, defendants filed a motion for summary judgment on the grounds that plaintiff failed to exhaust administrative remedies as to all federal claims and that plaintiff failed to comply with the pre-suit procedural requirements for his state law claims.  (ECF No. 36.) On April 28, 2022, Magistrate Judge Kendall Newman recommended that defendants' summary judgment motion be granted as to plaintiff's state law claims and as to all federal claims but for the Eighth Amendment claims arising from the allegations set forth in grievance no. CHCF-HC-20-000548.  (ECF No. 43.[2])  In grievance no. CHCF-HC-20-000548, plaintiff alleged that "IDTT

---

[2] For court orders and findings and recommendations referenced herein, the filing date is used to identify the document.

1    members…refused to provide any of the broad range of mental health services" which plaintiff

2    alleged were unavailable "due to overcrowding and extreme staff shortages…or the increase in

3    violence at CHCF."  (ECF No. 36-4 at 68.)  In grievance no. CHCF-HC-20-000548, plaintiff

4    stated that he had cut his neck on several occasions due to staff being overworked.  (Id.)

5    Magistrate Judge Newman recommended that plaintiff be granted leave to amend to identify the

6    Interdisciplinary Treatment Team ("IDTT") members identified in grievance no. CHCF-HC-20-

7    000548 and to set forth specific factual allegations contained in that grievance.  (ECF No. 43 at

8    24.)  On July 19, 2022, District Judge Troy Nunley adopted the April 28, 2022 findings and

9    recommendations and granted plaintiff thirty days to file a second amended complaint based on

10   the allegations set forth in grievance no. CHCF-HC-20-000548 against only those individuals

11   who were part of the IDTT referenced therein.  (ECF No. 47.)

12          On August 24, 2022, plaintiff filed a second amended complaint.  (ECF No. 48.)  On

13   November 21, 2022, the Court struck the claims and references to defendants Martin and Martel

14   as not permitted by the Court's July 19, 2022 order because these individuals were not members

15   of the IDTT.  (ECF No. 49.)  The Court found that the second amended complaint stated

16   potentially cognizable Eighth Amendment claims, limited to those exhausted through grievance

17   no. CHCF-HC-20-00548, against defendants Kieu, Lundgren and Levin,[3] members of the IDTT,

18   for their conduct between August 27, 2019 and September 11, 2019.  (Id.)  The Court ordered

19   defendant Kieu to file a responsive pleading within twenty-one days.  (Id.)  By separate order, the

20   Court directed service of defendants Lundgren and Levin.  (ECF No. 50.)

21   **IV. PLAINTIFF'S CLAIMS**

22          **A. Plaintiff's Allegations in Second Amended Complaint**

23          As indicated above, this action proceeds on plaintiff's second amended complaint as to

24   plaintiff's Eighth Amendment claims against defendants Staff Psychologist and plaintiff's MHPC

25   Kieu, CHCF Rehabilitation Therapist Lundgren and Social Worker Levin, members of the IDTT,

26   _____

27   [3] In the second amended complaint, plaintiff identified defendant Levin as defendant Bogacs.  In the summary judgment motion, defendants state that defendant Bogacs now goes by the last name Levin.  (ECF No. 77-4 at 2.)  For this reason, this Court refers to defendant Bogacs as defendant

28   Levin in these findings and recommendations.

1    for their conduct between August 27, 2019 and September 11, 2019.  (ECF Nos. 48, 49.)  The

2    alleged deprivations occurred at the CHCF.  (ECF No. 48 at 1.)

3         Plaintiff alleges that he filed grievance no. HC-20-000548 alleging that he was denied the

4    ability to participate in a broad range of mental health services due to a shortage of staff,

5    overcrowding and an increase in violence.  (Id. at 7.)

6         Plaintiff alleges that on August 29, 2019, plaintiff was transferred to CHCF Psychiatric

7    Inpatient Program ("PIP") for placement in CHCF's acute suicide prevention treatment program

8    for plaintiff's ongoing suicidality.  (Id.)  Defendant Kieu was assigned as plaintiff's clinician

9    upon plaintiff's arrival at CHCF-PIP.  (Id.)  From August 28, 2019 through October 7, 2019,

10   plaintiff was confined in his cell without any set treatment plan from defendant Kieu.  (Id.)

11        On September 11, 2019, defendant Lundgren met plaintiff at plaintiff's cell.  (Id. at 8.)

12   Plaintiff requested that he be allowed out of his cell to write letters with defendant Lundgren.

13   (Id.)  Defendant Lundgren denied this request and instructed plaintiff to ask "CNA" staff.  (Id.)

14   Plaintiff alleges that making such a request to "CNA" staff was prohibited.  (Id.)

15        From August 28, 2019 through September 11, 2019, during each of the IDTT sessions,

16   defendant Levin told plaintiff that it was not her job to run therapeutic groups when he asked for

17   such services.  (Id. at 10.)

18        **B.  Plaintiff's Legal Claims**

19        The district court's orders limited the claims in the second amended complaint to Eighth

20   Amendment claims based on allegations set forth in grievance no. CHCF-HC-20-00548 against

21   IDTT members Kieu, Levin and Lundgren for their conduct between August 27, 2019 and

22   September 11, 2019.  (ECF Nos. 43, 47, 49.)  Grievance no. CHCF-HC-20-00548 is dated

23   September 12, 2019.  (ECF No. 49, 36-4 at 66.)  In grievance no. CHCF-HC-20-00548, plaintiff

24   claimed that defendants refused to provide plaintiff with "any of the broad range of mental health

25   services as required pursuant to Article 9 Mental Health Services Tit. 15" due to overcrowding,

26   extreme staff shortages and the increase in violence at CHCF.  (ECF No. 36-4 at 66, 68.)

27   Plaintiff's second amended complaint includes claims regarding events occurring after September

28   11, 2019.  Accordingly, those claims are disregarded because they are not permitted by the

                                                6

1   district court's orders.  Therefore, the second amended complaint raises the following Eighth

2   Amendment claims: 1) against defendants Kieu, Levin and Lundgren for denying plaintiff access

3   to a broad range of mental health services, activities and programs due to staff shortages,

4   overcrowding and an increase in violence between August 27, 2019 and September 11, 2019;

5   2) against defendant Kieu for confining plaintiff in his cell without any set treatment plan from

6   August 27, 2019 through September 11, 2019; 3) against defendant Levin for denying plaintiff's

7   requests for therapeutic groups during IDTT meetings from August 28, 2019 through September

8   11, 2019; and 4) against defendant Lundgren for refusing to take plaintiff out of his cell on

9   September 11, 2019.

10       This Court observes that grievance no. CHCF-HC-20-00548 did not specifically raise

11   plaintiff's claims that defendant Kieu confined plaintiff in his cell without a treatment plan, that

12   defendant Levin denied plaintiff's request for therapeutic groups and that defendant Lundgren

13   refused to take plaintiff out of his cell on September 11, 2019.  In an abundance of caution, this

14   Court considers these claims below.  This Court also observes that though the claims permitted to

15   proceed in the second amended complaint were limited to conduct by defendants Kieu, Levin and

16   Lundgren between August 27, 2019 and September 11, 2019, defendants' summary judgment

17   motion addresses plaintiff's claims regarding events occurring after September 11, 2019,

18   apparently in an abundance of caution.  Because claims regarding events occurring after

19   September 11, 2019 are not permitted to proceed based on the district court's prior orders, this

20   Court will not address these claims.

21   **V. UNDISPUTED FACTS**

22       Plaintiff did not file a response to defendants' statement of undisputed facts.  Accordingly,

23   this Court finds that defendants' undisputed facts are undisputed to the extent they are supported

24   by the evidence cited.  If this Court finds that the evidence cited does not support the fact, that is

25   indicated below.  In organizing defendants' statement of undisputed facts, this Court uses the

26   headings listed in defendants' points and authorities.  (See ECF No. 77 at 10-25.)   This Court

27   will also not address defendants' undisputed facts regarding events occurring after September 11,

28   2019 unless they are relevant to the at-issue claims.

7

**A.  Undisputed Facts re: California Department of Corrections and Rehabilitation's Mental Health Delivery Services**

1.  At all relevant times, plaintiff was—and still is—a state inmate in the custody of the California Department of Corrections and Rehabilitation ("CDCR").  (ECF No. 77-2 at 2 (defendants' statement of undisputed facts), citing ECF No. 48 (plaintiff's second amended complaint).)

2.  CDCR provides mental health services to inmate-patients at several levels of care, from basic to acute.  (ECF No. 77-2 at 2, citing ECF No. 77-3 at 2 (declaration of defendant Kieu, ¶ 4).)

3.  CDCR's goal is to enable every inmate-patient to function in the least restrictive environment possible.  (ECF No. 77-2 at 2, citing ECF No. 77-3 at 3 (declaration of defendant Kieu, ¶ 5), ECF No. 77-5 at 2 (declaration of defendant Lundgren, ¶ 6).)

4.  CDCR's goal is also to provide constitutionally appropriate levels of mental health treatment to mentally ill inmates under its custody.  (ECF No. 77-2 at 2, citing ECF No. 77-3 at 3 (declaration of defendant Kieu, ¶ 5).)

5.  Generally, mental health treatment is designed to assist an inmate-patient stabilize his symptoms with his own coping skills.  (ECF No. 77-2 at 2, citing ECF No. 77-5 at 3 (declaration of defendant Lundgren, ¶ 7).)

6.  Mental health treatment also seeks to help expand inmate-patients' coping skills by adding to any existing repertoire of coping with specific symptoms  (ECF No. 77-2 at 2, citing ECF No. 77-5 at 3 (declaration of defendant Lundgren, ¶ 7).)

7.  Mental health treatment is most effective when one applies himself and is willing to learn new coping skills.  (ECF No. 77-2 at 2, citing ECF 77-5 at 3 (declaration of defendant Lundgren, ¶ 7).)

**B. Undisputed Fact re: the Psychiatric Inpatient Program at CHCF**

8.  CHCF is licensed by the State of California to provide twenty-four-hour-per-day services, immediately below the acute level of care that would be provided at a State Hospital.  (ECF No. 77-2 at 2, citing ECF No. 77-3 at 2-3 (declaration of defendant Kieu at ¶ 5).)

8

9. CHCF Psychiatric Inpatient Program ("PIP") is a 514-bed facility, with both an Acute Treatment Program ("ATP") and an Intermediate Treatment Program ("ITP").  (ECF No. 77-2 at 3, citing 77-5 at 2 (declaration of defendant Lundgren at ¶ 5).)

10. Inmate-patients admitted to the PIP would typically be transferred in from Mental Health Crisis Beds within CDCR's adult male institutions across California.  (ECF No. 77-2 at 3, citing ECF No. 77-3 at 2 (declaration of defendant Kieu at ¶ 2).)

11. Overall, CHCF provides mental health treatment to incarcerated people who have the most severe and long-term needs.  (ECF No. 77-2 at 3, citing ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 5).)

12. The PIP in particular, was designed to provide more intensive treatment for patients who cannot function adequately or stabilize in an outpatient program or shorter-term inpatient programs.  (ECF No. 77-2 at 3, citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 5).)

13. Prolonged time within an inpatient setting can be detrimental to one's overall mental health.  (ECF No. 77-2 at 3, citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 6).)

14. The PIP is designed to stabilize an inmate-patient's mental health and transfer him back to an outpatient setting.  (ECF No. 77-2 at 3, citing 77-5 at 2-3 (declaration of defendant Lundgren at ¶ 6).)

15. The PIP is colloquially known as a "treat and release" program.  (ECF No. 77-2 at 3, citing ECF No. 77-5 at 3 (declaration of defendant Lundgren at ¶ 6).)

16. ATP length of stay is approximately one month, during which time the treatment team is to determine if an inmate-patient requires more inpatient treatment, or if he is to be discharged to a lower level of care.  (ECF No. 77-2 at 3, citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 6).)

17. Plaintiff was admitted to PIP on August 27, 2019.  He remained there until November 6, 2019—a total of seventy-one days—when he discharged and transferred to the California Medical Facility.  (ECF No. 77-2 at 3-4, citing ECF No. 77-4 at 2 (declaration of

1    defendant Levin, ¶ 6).)

2    **C. The Role of the Interdisciplinary Treatment Team**

3    18.  In 2019, the PIP had recently switched to a Complete Care Model, meaning

4    that an Interdisciplinary Treatment Team ("IDTT") was responsible for delivering comprehensive

5    care for inmate-patients.  (ECF No. 77-2 at 4, citing ECF No. 77-3 at 4 (declaration of defendant

6    Kieu at ¶ 11), ECF No. 77-4 at 2 (declaration of defendant Levin at ¶ 5).)

7    19.  IDTTs are composed of medical, clinical and correctional staff, along with

8    involvement by the inmate-patients.  (ECF No. 77-2 at 4, citing ECF No. 77-3 at 4 (declaration of

9    defendant Kieu at ¶ 11).)

10   20.  From a mental health staffing perspective, each treatment team included a

11   psychiatrist, psychologist, clinical social worker and rehabilitation therapist.  (ECF No. 77-2 at 4,

12   citing ECF No. 77-4 at 2 (declaration of defendant Levin at ¶ 5).)

13   21.  Either the psychologist or the clinical social worker would be assigned as the

14   Mental Health Primary Clinician ("MHPC") for the inmate-patient, depending on the patient's

15   bed assignment.  (ECF No. 77-2 at 4, citing ECF No. 77-4 at 2 (declaration of defendant Levin at

16   ¶ 5).)

17   22.  If the MHPC was out of the office, the alternate psychologist or clinical social

18   worker would provide coverage, including for IDTT meetings.  (ECF No. 77-2 at 4, citing ECF

19   No. 77-4 at 2 (declaration of defendant Levin at ¶ 5).)

20   23.  IDTTs are vital in an inmate-patient's care.  (ECF No. 77-2 at 4, citing ECF

21   No. 77-3 at 4 (declaration of defendant Kieu at ¶ 11).)

22   24.  The role of IDTTs is to plan appropriate care and treatment, gather

23   information from various disciplines to monitor patient progress, evaluate patient treatment needs

24   and changes to treatment on an ongoing basis, optimize the level of functioning of inmate-patients

25   in the least restrictive environment, and treat and supervise inmate-patients in the appropriate

26   level of care.  (ECF No. 77-2 at 4, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶

27   11).)

28   25.  The goal of IDTT members is to identify symptoms that need to be addressed

10

in treatment, identify treatment goals and evaluate effectiveness, identify barriers to meeting treatment goals, review and evaluate treatment effects, plans and services to meet evolving needs, and determine the most appropriate level of care.  (ECF No. 77-2 at 5, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶ 11).)

26.  Per licensing requirements for the facility, a written interdisciplinary treatment plan must be developed and implemented by the IDTT for each patient as soon as possible after admission in the PIP, but no later than seventy-two hours following admission.  (ECF No. 77-2 at 5, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶ 11).)

27.  IDTTs were held on a weekly basis for each inmate in the PIP.  (ECF No. 77-2 at 5, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 8).)

28.  During the time that plaintiff was in the PIP, ten weekly IDTTs were conducted.  (ECF No. 77-2 at 5, citing ECF No. 77-3 at 13 (declaration of defendant Kieu at ¶ 49); ECF No. 77-5 at 7 (declaration of defendant Lundgren at ¶ 26); ECF No. 77-4 at 5 (declaration of defendant Levin at ¶ 14).)

**D. Plaintiff's Mental Health Background**

29.  Prior to being received in the PIP, plaintiff was in a Mental Health Crisis Bed at a different institution, where his symptoms had not stabilized.  (ECF No. 77-2 at 6, citing ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 8).)

30.  At the prior institution, plaintiff made conditional threats to cut his throat if he was not transferred to a higher level of care.  (ECF No. 77-2 at 6, citing ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 8).)

31.  While housed at California State Prison-Corcoran on or around July 2, 2018, plaintiff was diagnosed with Unspecified Depressive Disorder and Borderline Personality Disorder.  (ECF No. 77-2 at 6, citing ECF No. 77-5 at 75 (plaintiff's medical/mental health records).)

32.  Plaintiff was admitted to the PIP for suicidal ideation, suicide gestures and suicide attempts.  (ECF No. 77-2 at 6, citing ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 7); ECF No. 77-5 at 85 (plaintiff's medical/mental health records).)

33.  Plaintiff's mental health records denote a history of parasuicidal behavior (i.e., an apparent attempt at suicide, commonly called a suicidal gesture, in which the aim is not death) for secondary gain.  (ECF No. 77-2 at 6, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶ 10); ECF No. 77-5 at 90 (plaintiff's medical/mental health records).)

34.  Plaintiff was also noted to have a history of making paranoid and delusional statements about custody staff, as well as a history of suicidal ideation with the goal to manipulate and control.  (ECF No. 77-2 at 6, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶ 10); ECF No. 77-5 at 90 (plaintiff's medical/mental health records).)

**E. Mental Health Treatment Available to Plaintiff in the PIP**

35.  The expectation for plaintiff's treatment in the PIP was that he would achieve baseline functioning to program safely and effectively at his appropriate level of care while maintaining treatment compliance.  (ECF No. 77-2 at 6, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at ¶ 15).)

36.  In undisputed fact no. 36, defendants refer to paragraph 3 of defendant Kieu's declaration for the statement that, "Generally speaking, plaintiff had access to psychotherapy, milieu therapy, crisis management, group therapy, in-cell coping activities, psychotropic medications, and regular access to his mental health treatment team, including during weekly IDTTs."  (ECF No. 77-2 at 6-7.)  Paragraph 3 of defendant Kieu's declaration does not contain all of the information alleged in undisputed fact no. 3.  Accordingly, this Court finds that it is undisputed that plaintiff generally had access to those programs identified in paragraph 3 of defendant Kieu's declaration: positive Behavior Intervention Plans, milieu therapy, crisis management therapy, group therapy, and daily and weekly IDTT meetings to monitor inmate-patient progress as implemented on treatment care plans.  (ECF No. 77-3 at 2.)

37.  Therapeutic leisure groups are supervised recreational activities to reduce stress, improve self-esteem, foster interpersonal interactions, and promote the constructive use of leisure time by focusing on themes such as daily living skills, symptom management, focused mental health issues, social skills, anger management, stress management, substance use, offense-specific groups, family issues, and rational behavior/reality decision making.  (ECF No. 77-2 at 7,

1    citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 5).)

2            38.   There is no pre-determined amount of groups or activities that inmate-patients

3    in the PIP must receive; treatment is customized to the specific needs of each inmate patient.

4    (ECF No. 77-2 at 7, citing ECF No. 77-3 at 13 (declaration of defendant Kieu at ¶ 47).)

5            39.   Participation in the therapeutic groups is determined by the inmate-patients'

6    safety risks.  (ECF No. 77-2 at 7, citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at

7    ¶ 4).)

8            40.   Typically, inmate-patients who endorse suicidal ideation, suicide attempts, or

9    threaten staff, are not removed from their cells to attend groups.  (ECF No. 77-2 at 7, citing ECF

10   No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 4).)

11           41.   Instead, their participation in groups, as well as increased privileges and

12   activities, is based on demonstrated progress and compliance with the treatment plan.  (ECF No.

13   77-2 at 7, citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 4).)

14           42.   At a minimum, and as appropriate, suicidal inmate-patients are provided in-

15   cell materials to encourage positive recreational time.  (ECF No. 77-2 at 7, citing ECF No. 77-5 at

16   2 (declaration of defendant Lundgren at ¶ 4).)

17       **F. Defendants' Roles in Plaintiff's Mental Health Treatment**

18           1. <u>Defendant Kieu</u>

19               *a. Background*

20           43.   Defendant Kieu was a staff psychologist and plaintiff's MHPC.

21   (ECF No. 77-2 at 8, citing ECF No. 77-3 at 1 (declaration of defendant Kieu at ¶ 2).)

22           44.   In that position, defendant Kieu managed and oversaw clinical care with a

23   multidisciplinary team on the institution's PIP for inmate-patients transferred from Mental Health

24   Crisis Beds at other institutions.  (ECF No. 77-2 at 8, citing ECF No. 77-3 at 1-2 (declaration of

25   defendant Kieu at ¶ 2).)

26           45.   Defendant Kieu attended nine of the ten IDTTs held while plaintiff was in the

27   PIP.  (ECF No. 77-2 at 8, citing ECF No. 77-3 at 13-14 (declaration of defendant Kieu at ¶¶ 49-

28   50).)

*b. Defendant Kieu's Interactions with Plaintiff*

46.  Defendant Kieu performed plaintiff's initial intake assessment on August 29, 2019.  (ECF No. 77-2 at 8, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶ 10); ECF No. 77-5 at ECF Nos. 121-122 (plaintiff's medical/mental health records).)

47.  Defendant Kieu noted that, upon his arrival in the PIP two days earlier, plaintiff refused all medical assessment, including vital signs.  (ECF No. 77-2 at 8, citing ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 7); ECF No. 77-5 at 22 (plaintiff's medical/mental health records reflecting that plaintiff "refused all PMU assessment including vital signs.").)

48.  In the evening hours of August 27, 2019, plaintiff appeared to have engaged in self-injurious behavior by way of opening an old wound to his neck, with no active bleeding.  (ECF No. 77-2 at 8, citing ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 7); ECF No. 77-5 at 55-56 (plaintiff's medical/mental health records).)

49.  During his second day in the PIP, on August 28, 2019, plaintiff refused his psychotropic medication and his statements to staff members were indicative of his overall stay in the PIP:  "[I'm going to] get what I want[.]  [I've] been here before.  On 1A they did everything I said.  I'll do what I gotta do."  (ECF No. 77-2 at 8, citing ECF No. ECF No. 77-3 at 3 (declaration of defendant Kieu at ¶ 9); ECF No. 77-5 at 55 (plaintiff's medical/mental health records).)

50.  Defendant Kieu developed plaintiff's initial master treatment plan.  (ECF No. 77-2 at 9, citing ECF No. 77-3 at 4 (declaration of defendant Kieu at ¶ 13); ECF No. 77-5 at 70-80 (plaintiff's master treatment plan dated August 29, 2019).)

51.  During the initial IDTT meeting, held on August 29, 2019 and attended by defendants Lieu, Lundgren and Levin, a nurse and plaintiff, the goals for treatment were discussed, as well as program expectations, treatment opportunities, medications and IDTT schedule.  (ECF No. 77-2 at 9, citing ECF No. 77-3 at 4-5 (declaration of defendant Kieu at ¶ 13); ECF No. 77-5 at 71 (plaintiff's medical/mental health records).)

52.  During the initial IDTT meeting, plaintiff was irritable and began making demands, such as being moved to another cell and instructing staff how to administer medication

14

1  to him.  (ECF No. 77-2 at 9, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at ¶ 13);

2  ECF No. 77-5 at 71 (plaintiff's medical/mental health records).)

3         53.  In her records from August 29, 2019, defendant Kieu wrote that plaintiff has a

4  schema in which he externalizes blame and responsibility.  (ECF No. 77-2 at 9, citing ECF No.

5  77-3 at 5 (declaration of defendant Kieu at ¶ 14); ECF No. 77-5 at 76 (plaintiff's medical/mental

6  health records).)

7         54.  In her records from August 29, 2019, defendant Kieu wrote that when this

8  schema is threatened or challenged, plaintiff lashes out at those individuals, more often through

9  litigation.  (ECF No. 77-2 at 9, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at ¶ 14);

10 ECF No. 77-5 at 76 (plaintiff's medical/mental health records).)

11        55.  In her records from August 29, 2019, defendant Kieu also wrote that plaintiff

12 had ongoing lawsuits against several CDCR members for what he described as "mistreatment and

13 harassment."  (ECF No. 77-2 at 9, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at

14 ¶ 14); ECF No. 77-5 at 76 (plaintiff's medical/mental health records).)

15        56.  In her records from August 29, 2019, defendant Kieu wrote that plaintiff has

16 low distress tolerance and self-harm is his primary means of relief, with over fifteen suicide

17 attempts before August 2019—either as stress relief or to achieve personal goals.  (ECF No. 77-2

18 at 9, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at ¶ 14); ECF No. 77-5 at 76

19 (plaintiff's medical/mental health records).)

20        57.  The expectation for plaintiff's treatment in the PIP was that plaintiff would

21 achieve baseline functioning to program safely and effectively at his appropriate level of care

22 while maintaining treatment compliance.  As part of this, it was expected that plaintiff would

23 participate in all treatment, including individual counseling, group therapy and medication

24 compliance.  (ECF No. 77-2 at 10, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at

25 ¶ 15); ECF No. 77-5 at 80 (plaintiff's medical/mental health records).)

26        58.  The specific treatment goals were: (1) not engage in self-injurious behavior or

27 suicide attempts for at least four consecutive weeks; (2) not endorse suicide ideation for at least

28 two consecutive weeks; (3) continue taking medications as prescribed for at least thirty

15

consecutive days; (4) learn to utilize effectively at least two distress tolerance skills and

mindfulness skills; and (5) learn to utilize at least two alternative behaviors for self-injurious

behaviors.  (ECF No. 77-2 at 10, citing ECF No. 77-3 at 5 (declaration of defendant Kieu at ¶ 15);

ECF No. 77-5 at 80 (plaintiff's medical/mental health records).)

59.  At the second IDTT, on September 4, 2019, plaintiff was argumentative and

refused to respond to questions relevant to the topics being discussed by the treatment team.

(ECF No. 77-2 at 10, citing ECF No. 77-3 at 5-6 (declaration of defendant Kieu at ¶ 17); ECF No.

77-5 at 154-55 (plaintiff's medical/mental health records).)

60.  At the second IDTT meeting, on September 4, 2019, plaintiff claimed that he

tried to cut his throat with something the day before, but no skin breakdown was noted to the neck

area.  (ECF No. 77-2 at 10, citing ECF No. 77-3 at 5-6 (declaration of defendant Kieu at ¶ 17);

ECF No. 77-5 at 154 (plaintiff's medical/mental health records).)

61.  At the second IDTT meeting, on September 4, 2019, plaintiff stated that he

does not want to take his Buspar (prescribed to treat anxiety) because it is crushed.  (ECF No. 77-

2 at 10, citing ECF No. 77-5 at 154 (plaintiff's medical/medical record).)

Defendants' undisputed fact no. 61 and defendant Kieu's declaration state that

plaintiff admitted to not complying with his psychotropic medication regimen, specifically

Buspar.  (ECF No. 77-2 at 10; ECF No. 77-3 at 6.)  The record from the September 4, 2019 IDDT

meeting state that plaintiff stated that "he does not want to take his Buspar because it is crushed."

(ECF No. 77-5 at 154).  It is unclear from plaintiff's mental health record whether plaintiff told

the IDTT that he was refusing to take Buspar.  For this reason, this Court cites the entry in

plaintiff's mental health record.

62.  After the September 4, 2019 IDTT meeting, plaintiff stated to one of the staff

members, "[I am] getting off orientation today and gonna get all my shit back…they are gonna

have to program me because [I'm] a legal paper pusher."  (ECF No. 77-2 at 10-11, citing ECF

No. 77-3 at 6 (declaration of defendant Kieu at ¶ 17); ECF No. 77-5 at 151 (plaintiff's

medical/mental health records).)

63.  On September 4, 2019, during a separate confidential session with defendant

1   Kieu, plaintiff stated, "I know you try to do your best but the staff here are not doing their jobs."

2   (ECF No. 77-2 at 11, citing ECF No. 77-3 at 6 (declaration of defendant Kieu at ¶ 18); ECF No.

3   77-5 at 182 (plaintiff's medical/mental health records).)

4          64.   Plaintiff saw himself as an advocate for other inmate-patients and for the

5   "bigger picture of mental health."  (ECF No. 77-2 at 11, citing ECF No. 77-3 at 6 (declaration of

6   defendant Kieu at ¶ 18); ECF No. 77-5 at 182 (plaintiff's medical/mental health records).)

7          65.   On September 6, 2019, plaintiff remained on one-on-one enhanced

8   observation due to reported suicidal ideation.  (ECF No. 77-2 at 11, citing ECF No. 77-3 at 6

9   (declaration of defendant Kieu at ¶ 19); ECF No. 77-5 at 120 (plaintiff's medical/mental health

10  records).)

11         66.   Plaintiff's access to objects he could use to harm himself was strictly limited

12  since he was admitted to the PIP, until he could demonstrate stable and appropriate behaviors.

13  (ECF No. 77-2 at 11, citing ECF No. 77-3 at 6 (declaration of defendant Kieu at ¶ 19); ECF No.

14  77-5 at 120 (plaintiff's medical/mental health records).)

15         67.   The goal was to allow plaintiff increased privileges commensurate with his

16  demonstrated ability to maintain his personal safety.  (ECF No. 77-2 at 11, citing ECF No. 77-3 at

17  6 (declaration of defendant Kieu at ¶ 19); ECF No. 77-5 at 120 (plaintiff's medical/mental health

18  records).)

19         68.   In her records from the September 4, 2019 session with plaintiff, defendant

20  Kieu noted the following goals for the treatment team:

21          Specifically, treatment team will focus on exploring psychological
            pain (hurt, stress) and overall reduction of depressive and anxiety
22          symptoms, through the use of CBT intervention techniques, and
            psychoeducation in individual and group treatment.  Treatment team
23          will assist him with gaining insight into his mental health symptoms,
            the specific triggers leading to increased symptom reporting,
24          identifying his behavior response patterns, and the development of
            various coping strategies.   Treatment team will assist him with
25          building upon protective factors such as maintaining health and
            regular contact with family via phone call and letters, encourage him
26          to develop a regular exercise to incorporate into his daily routine, and
            help him identify reasons to live, [and] personal values that can be
27          utilized to develop specific goals meaningful to him.  Treatment team
            will discuss with [plaintiff] ways to recognize changes in his
28          thoughts and mood that indicate[] a crisis may be developing and

17

1    encouraged him to speak to staff when feel[ing] distressed and
     unsafe.

2

3    (ECF No. 77-2 at 11-12, citing ECF No. 77-5 at 120 (plaintiff's medical/mental health records).)

4            69.  During a confidential meeting on September 10, 2019, plaintiff again re-

5    assured defendant Kieu that he would be non-compliant with his psychotropic medication

6    regimen and continued to talk nonstop about perceived issues related to program, policy and

7    staffing.  (ECF No. 77-2 at 12, citing ECF No. 77-3 at 6 (declaration of defendant Kieu); ECF No.

8    77-5 at 202-03 (plaintiff's medical/mental health records).)

9            This Court notes that in her notes from the September 10, 2019 meeting, defendant

10   Kieu wrote, "Patient also expressed his frustration towards his Buspar being crushed and floated,

11   stating that, 'It's violated policy, caused health risk, tear my esophagus.  Unless you do it the right

12   way, I'm not taking it.'"  (ECF No. 77-5 at 202.)

13           70.  During the third IDTT meeting on September 11, 2019, plaintiff remained

14   preoccupied with program and policy, focusing on staffing issues and other patients while

15   threatening to submit administrative grievances against staff members; he did not answer

16   questions about treatment goals.  (ECF No. 77-2 at 12, citing ECF No. 77-3 at 7 (declaration of

17   defendant Kieu at ¶ 21); ECF 77-5 at 217 (plaintiff's medical/mental health records).)

18           71.  Although plaintiff expressed a desire to participate in group programming, he

19   could not commit to maintain his own safety if he was given access to materials which he could

20   use to harm himself.  (ECF No. 77-2 at 12, citing 77-3 at 7 (declaration of defendant Kieu at

21   ¶ 21); ECF No. 77-5 at 217 (plaintiff's medical/mental health records).)

22           72.  Plaintiff was continued on one-on-one observations.  (ECF No. 77-2 at 12,

23   citing ECF No. 77-3 at 7 (declaration of defendant Kieu at ¶ 21)).

24           73.  On September 11, 2019, plaintiff's psychiatrist noted that plaintiff would be

25   monitored for "possible exaggerated symptoms."  (ECF No. 77-2 at 12, citing ECF No. 77-3 at 7

26   (declaration of defendant Kieu at ¶ 22); ECF No. 77-5 at 238 (plaintiff's medical/mental health

27   records).)

28   / / / /

18

*c. Defendant Kieu's Assessment of Plaintiff's Time in the PIP*

137. Overall, during his time in the PIP, plaintiff received daily MHPC treatment, as well as continued medication monitoring. (ECF No. 77-2 at 21, citing ECF No. 77-3 at 13 (declaration of defendant Kieu at ¶ 47).)

138. In undisputed fact no. 138, defendants state that during the first half of his treatment, plaintiff remained on one-on-one observations in a safety smock, since he persistently stated that he experienced suicidal ideation and did not feel safe. (ECF No. 77-2 at 22, citing ECF No. 77-3 at 13 (declaration of defendant Kieu at ¶ 47)). This statement is not accurate because defendants presented evidence that plaintiff was removed from one-on-one status on or around September 17, 2019 and given prison blues to replace the safety smock on September 18, 2019. (See declaration of defendant Kieu at ¶28, ¶ 29 (ECF No. 77-3 at 8).) Plaintiff transferred away from the PIP to the California Medical Facility on November 6, 2019. (See undisputed fact no. 17).

139. When plaintiff was on suicide watch, it was because he presented a severe suicide risk and his safety was most important at that time. (ECF No. 77-2 at 22, citing ECF No. 77-3 at 13 (declaration of defendant Kieu at ¶ 47).)

140. In addition, plaintiff engaged in several self-injurious incidents on August 27, September 2, September 13 and September 17, 2019. (ECF No. 77-2 at 22, citing ECF No. 77-3 at 13 (declaration of defendant Kieu at ¶ 47); ECF No. 77-5 at 482 (plaintiff's medical/mental health records).)

2. Defendant Lundgren

*a. Background*

144. During the relevant times of this lawsuit, defendant Lundgren was a Rehabilitation Therapist at CHCF. (ECF No. 77-2 at 22, citing ECF No. 77-5 at 1 (declaration of defendant Lundgren at ¶ 2).)

145. Among other things, defendant Lundgren conducted therapeutic leisure groups to give inmate-patients the opportunity to socialize, learn appropriate competitiveness, exercise cognitive abilities, learn to problem-solve, and reduce or eliminate effects of mental

health issues.  (ECF No. 77-2 at 22, citing ECF No. 77-5 at 2 (declaration of defendant Lundgren at ¶ 3).)

146.  Defendant Lundgren attended six of the total ten IDTTs held while plaintiff was in the PIP.  (ECF No. 77-2 at 22, citing ECF No. 77-5 at 7 (declaration of defendant Lundgren at ¶ 26).)

*b. Defendant Lundgren's Interactions with Plaintiff*

147.  Defendant Lundgren's first interaction with plaintiff was during the initial IDTT on August 29, 2019.  (ECF No. 77-2 at 23, citing ECF No. 77-5 at 3 (declaration of defendant Lundgren at ¶ 11); ECF No. 77-5 at 70 (plaintiff's medical/mental health records).)

148.  On August 30, 2019, defendant Lundgren performed her initial Rehabilitation Therapy assessment of plaintiff; plaintiff indicated he was a "jailhouse lawyer." (ECF No. 77-2 at 23, citing ECF No. 77-5 at 3 (declaration of defendant Lundgren at ¶ 11); ECF No. 77-5 at 128 (plaintiff's medical/mental health records).)

149.  During the August 30, 2019 assessment, plaintiff indicated that he wanted to help identify his triggers, which he described as, "Misconceptions, disrespect, custody.  Anyone thinking [they're] better than me."  (ECF No. 77-2 at 23, citing ECF No. 77-5 at 3-4 (declaration of defendant Lundgren at ¶ 11); ECF No. 77-5 at 129 (plaintiff's medical/mental health records).)

150.  Defendant Lundgren noted that plaintiff may have had safety concerns at his prior institution, which could have been a motivating factor for him to remain in the PIP.  (ECF No. 77-2 at 23, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 11); ECF No. 77-5 at 129 (plaintiff's medical/mental health records).)

151.  From a Rehabilitation Therapy perspective, defendant Lundgren noted in the record from the August 30, 2019 assessment that the goal was for plaintiff to engage in at least two leisure or coping skills to manage stress by the following weekly IDTT.  (ECF No. 77-2 at 23, citing ECF No. 77-5 at 5 (declaration of defendant Lundgren at ¶ 11); ECF No. 77-5 at 85 (plaintiff's medical/mental health records).)

152.  On September 10, 2019, defendant Lundgren saw plaintiff again and noted that he remained on one-on-one observation due to ongoing claims of being suicidal.  (ECF No.

20

77-2 at 23, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 12); ECF No. 77-5 at 198 (plaintiff's medical/mental health records).)

153. On September 10, 2019, plaintiff demanded specific in-cell materials and was provided with a folder of puzzles by defendant Lundgren.  (ECF No. 77-2 at 23, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 12); ECF No. 77-5 at 198 (plaintiff's medical/mental health records).)

154. A staff member noted that plaintiff did not demonstrate any genuine attempts to be removed from one-on-one observation so he could start attending therapeutic groups.  (ECF No. 77-2 at 23, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 12); ECF No. 77-5 at 198 (plaintiff's medical/mental health records).)

This Court observes that in her declaration, defendant Lundgren states that another staff member noted that plaintiff did not demonstrate any genuine attempts to be removed from on-on-one.  (ECF No. 77-4 at 4.)  However, it appears that defendant Lundgren electronically signed the record containing this statement on September 11, 2019.  (ECF No. 77-5 at 198.)

155. On September 11, 2019, defendant Lundgren checked on plaintiff and the availability of in-cell coping materials.  Plaintiff was hostile.  (ECF No. 77-2 at 24, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 13); ECF No. 77-5 at 210-11 (plaintiff's medical/mental health records).)

156. On the one hand, plaintiff stated that he wanted to come out of his cell for group therapy.  (ECF No. 77-2 at 24, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 13); ECF No. 77-5 at 211 (plaintiff's medical/mental health records).)

157. On the other hand, referring to one-on-one observation, plaintiff stated, "I need it.  I need it so staff doesn't come into my cell."  (ECF No. 77-2 at 24, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 13); ECF No. 77-5 at 211 (plaintiff's medical/mental health records).)

158. During the weekly IDTT meeting on September 11, 2019, plaintiff kept interrupting members of the treatment team and was argumentative.  (ECF No. 77-2 at 24, citing ECF No. 77-5 at 4 (declaration of defendant Lundgren at ¶ 13); ECF No. 77-5 at 211 (plaintiff's

21

1    medical/mental health records).)

2                  3. <u>Defendant Levin</u>

3                     *a. Background*

4          188.  In 2019, defendant Levin's last name was Bogacs and she worked as a

5    Clinical Social Worker.  (ECF No. 77-2 at 28, citing ECF No. 77-4 at 2 (declaration of defendant

6    Levin at ¶ 3).)

7          189.  Defendant Levin was never assigned plaintiff's MHPC.  (ECF No. 77-2 at

8    28, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 7).)

9          190.  Defendant Levin's sole involvement in the allegations at issue in this lawsuit

10    was her participation in most (but not all) weekly IDTTs—specifically, updating treatment plans,

11    and documenting plaintiff's responses to questionnaires and questions during IDTTs.  (ECF No.

12    77-2 at 28, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶¶ 7-8).)

13          191.  Defendant Levin attended eight of the ten weekly IDTTs and her interactions

14    with plaintiff were limited to seeing him during weekly IDTTs.  (ECF No. 77-2 at 28, citing ECF

15    No. 77-4 at 5 (declaration of defendant Levin at ¶¶ 14-15).)

16             *b. Defendant Levin's Interactions with Plaintiff*

17          192.  Defendant Levin first met plaintiff on August 29, 2019 during the initial

18    IDTT.  (ECF No. 77-2 at 28, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 9);

19    ECF No. 77-5 at 70 (plaintiff's medical/mental health records).)

20          193.  Defendant Levin documented some of the statements made by plaintiff

21    during the first August 29, 2019 IDTT.  For instance, plaintiff stated, "Once I get agitated, this is

22    fair notice, I start to dismantle shit."  (ECF No. 77-2 at 29, citing ECF No. 77-4 at 3 (declaration

23    of defendant Levin at ¶ 9); ECF No. 77-5 at 81 (plaintiff's medical/mental health records).)

24          194.  In her notes from the August 29, 2019 IDTT, defendant Levin noted that

25    plaintiff was on enhanced one-on-one observation due to self-injurious behavior.  (ECF No. 77-2

26    at 29, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 9); ECF No. 77-5 at 81

27    (plaintiff's medical/mental health records).)

28          195.  The second time defendant Levin saw plaintiff was during the IDTT on

September 11, 2019.  Similar to the initial IDTT, plaintiff was irritable and argumentative.  (ECF No. 77-2 at 29, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

196.  At the second IDTT, plaintiff frequently interrupted the treatment team members, evaded questions and continued to shift focus away from his own mental health treatment to perceived systemic issues.  (ECF No. 77-2 at 29, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

197.  At the second IDTT, plaintiff indicated he had recently cut his neck using a staple and voiced overall dissatisfaction with his treatment, saying he was spending too much time inside the cell.  (ECF No. 77-2 at 29, citing ECF No. 77-4 at 3 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

198.  At the second IDTT, although plaintiff was requesting to participate in group programming, where he would have had access to materials he could use for more self-harm, he was unable to make a commitment to personal safety.  (ECF No. 77-2 at 29, citing ECF No. 77-4 at 3-4 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

199.  At the second IDTT meeting, plaintiff reported ongoing, persistent suicidal ideation.  (ECF No. 77-2 at 29, citing ECF No. 77-4 at 4 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

200.  At the second IDTT meeting, plaintiff asked defendant Levin, "What are you supposed to do for me?"  When she attempted to explain her role on the treatment team, plaintiff cut her off.  (ECF No. 77-2 at 30, citing ECF No. 77-4 at 4 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

201.  At the second IDTT meeting, defendant Levin offered plaintiff in-cell coping skills worksheets, to which plaintiff responded, "Is that supposed to be good enough?"  Plaintiff refused the offer of in-cell materials.  (ECF No. 77-2 at 30, citing ECF No. 77-4 at 4 (declaration of defendant Levin at ¶ 10); ECF No. 77-5 at 214 (plaintiff's medical/mental health records).)

1   **VI.  DISCUSSION OF DEFENDANTS' SUMMARY JUDGMENT MOTION**

2       **A.  Legal Standard for Eighth Amendment Claim**

3          The Constitution requires prison officials to provide inmates with reasonably adequate

4   medical and mental health care.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97, 103 (1976).  To hold an

5   official liable for violating this duty under the Eighth Amendment, the inmate must satisfy two

6   prongs, an objective prong and subjective prong.  First, the inmate must suffer from a serious

7   medical or mental health need (the objective prong); and second, the official must be deliberately

8   indifferent to the inmate's serious medical or mental health need (the subjective prong).  <u>See</u>

9   <u>Snow v. McDaniel</u>, 681 F.3d 978, 985 (9th Cir. 2012), overruled in part on other grounds, <u>Peralta</u>

10  <u>v. Dillard</u>, 744 F.3d 1076, 1082-83 (9th Cir. 2014); <u>Wilhelm v. Rotman</u>, 680 F.3d 1113, 1122

11  (9th Cir. 2012).  A medical or mental health need is "serious" if the failure to treat "could result in

12  further significant injury or the unnecessary and wanton infliction of pain."  <u>Jett v. Penner</u>, 439

13  F.3d 1091, 1096 (9th Cir. 2006) (internal citations omitted).  The "second prong—defendant's

14  response to the need was deliberately indifferent—is satisfied by showing (a) a purposeful act or

15  failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the

16  indifference."  <u>Id.</u> (internal citations omitted).  This standard requires that the prison official must

17  not only "be aware of facts from which the inference could be drawn that a substantial risk of

18  serious harm exists," but that person "must also draw the inference."  <u>Farmer v. Brennan</u>, 511

19  U.S. 825, 837 (1994).  This "subjective approach" focuses only "on what a defendant's mental

20  attitude actually was (or is), rather than what it should have been (or should be)…"  <u>Farmer</u>, 511

21  U.S. at 839.  Deliberate indifference is a higher standard than medical negligence or malpractice,

22  and a difference of opinion between medical professionals—or between a physician and the

23  prisoner—generally does not amount to deliberate indifference.  <u>See</u> <u>Toguchi v. Chung</u>, 391 F.3d

24  1051, 1060 (9th Cir. 2004); <u>Jackson v. McIntosh</u>, 90 F.3d 330, 332 (9th Cir. 1996), overruled in

25  part on other grounds by <u>Peralta v. Dillard</u>, 744 F.3d 1076 (9th Cir. 2014) (en banc) (A mere

26  "difference of medical opinion ... [is] insufficient, as a matter of law, to establish deliberate

27  indifference.").  To prevail on a claim involving choices between alternative courses of treatment,

28  a prisoner must show that the chosen course of treatment "was medically unacceptable under the

24

1    circumstances," and was chosen "in conscious disregard of an excessive risk to [the prisoner's]

2    health."  Jackson, 90 F.3d at 332.

3         Neither will an "inadvertent failure to provide medical care" sustain a claim.  See Estelle,

4    429 U.S. at 105.  Misdiagnosis alone is not a basis for a claim, see Wilhelm, 680 F.3d at 1123,

5    and a "mere delay" in treatment, "without more, is insufficient to state a claim of deliberate

6    medical indifference," Shapley v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th

7    Cir. 1985).  Instead, a prisoner must show that a delay "would cause significant harm and that

8    defendants should have known this to be the case."  Hallett v. Morgan, 296 F.3d 732, 746 (9th

9    Cir. 2002).

10        **B. Defendants' Arguments**

11        In the summary judgment motion, defendants acknowledge the legal claims this Court

12   identified above: 1) plaintiff was denied mental health services due to understaffing,

13   overcrowding and an increase in violence between August 27, 2019 and September 11, 2019;

14   2) from August 27, 2019 to September 11, 2019, plaintiff was confined in his cell without any set

15   treatment plan by defendant Kieu; 3) on September 11, 2019, defendant Lundgren denied

16   plaintiff's requests to come out of his cell; and 4) during the IDTT sessions between August 28,

17   2019 and September 11, 2019, when plaintiff requested access to therapeutic groups, defendant

18   Levin told plaintiff that it was not her job to conduct such groups.  (Defs. MSJ at 2, ECF No. 77.)

19   In the section of the summary judgment motion addressing plaintiff's claims, defendants

20   specifically address the following claims: 1) defendant Kieu failed to prepare a set treatment plan

21   for plaintiff; and 2) defendant Levin denied plaintiff's requests for therapeutic groups during

22   IDTT meetings.  (Defs. MSJ at 21-22, ECF No. 77.)  Defendants generally argue that plaintiff

23   was not denied access to adequate mental health treatment.  (Defs. MSJ at 21-22, ECF No. 77.)

24        This Court next sets forth defendants' arguments in support of their summary judgment

25   motion.  Defendants argue that the undisputed evidence demonstrates that defendant Kieu

26   prepared a set treatment plan for plaintiff, along with clear goals and expectations, two days after

27   plaintiff arrived in the PIP.  (Defs. MSJ at 21, citing undisputed facts nos. 50-51 and 57-58, ECF

28   No. 77.)  Defendants argue that the initial master plan was comprehensive, but not static.  The

plan was updated regularly, after each weekly IDTT.  (Defs. MSJ at 21, citing undisputed facts nos. 28, 51, 59, 70, ECF No. 77.)  Plaintiff's treatment was dependent on plaintiff's active participation and cooperation with his treatment team and demonstrated progress toward meeting treatment goals.  (Defs. MSJ at 21, citing undisputed facts nos. 19, 38-41, ECF No. 77.)  There is no pre-determined amount of therapeutic groups or activities that plaintiff had to receive; rather, treatment was customized to plaintiff's specific needs and progress.  (Defs. MSJ at 21, citing undisputed facts nos. 38, 41, ECF No. 77.)  Plaintiff had access to milieu therapy, crisis management, group therapy, psychotropic medication, and daily MHPC treatment and weekly IDTT meetings.  (Defs. MSJ at 21, citing undisputed facts nos. 36, 137, ECF No. 77.)  At the second IDTT, on September 4, 2019, plaintiff was argumentative and refused to respond to questions relevant to the topics being discussed by the treatment team.  (Defs. MSJ at 21, citing undisputed facts nos. 59, ECF No. 77.)  During the relevant time period, plaintiff refused psychiatric medication designed to alleviate his depression and anxiety.  (Defs. MSJ at 21, citing undisputed facts nos. 49, 61, 69, ECF No. 77.)  At the second IDTT meeting, defendant Levin offered plaintiff in-cell coping skills worksheets, to which plaintiff responded, "Is that supposed to be good enough?"  Plaintiff refused the offer of in-cell materials.  (Defs. MSJ at 21, citing undisputed fact no. 201, ECF No. 77.)

Defendants argue that during the first half of his treatment in the PIP, plaintiff remained on one-on-one observation, inside his cell, due to self-injurious behaviors and because he persistently expressed suicidal ideation.  (Defs. MSJ at 21, citing undisputed fact no. 60, ECF No. 77.)  This Court observes that defendants presented evidence demonstrating that plaintiff was removed from one-on-one status on or around September 17, 2019.  (See Undisputed Fact No. 138.)  Defendants contend that while plaintiff was on one-on-one observation, plaintiff could not attend groups because he could not commit to personal safety.  (Defs. MSJ at 21-22, citing undisputed facts nos. 71, 199, ECF No. 77; see also nos. 70, 198.)  This Court observes that defendants present evidence showing that plaintiff attended his first group therapy meeting on September 18, 2019, after he was removed from one-on-one observation.  (See ECF No. 77-5 at 336.)

1    Regarding defendant Levin, defendants argue that the undisputed evidence shows that

2    defendant Levin was not involved in plaintiff's mental health treatment in any substantive way,

3    other than attending weekly IDTTs and updating plaintiff's mental health records.  Defendants

4    argue that it is undisputed that defendant Levin was never plaintiff's MHPC and her interactions

5    with plaintiff were limited to seeing plaintiff during the weekly IDTTs.  (Defs. MSJ at 22, citing

6    undisputed facts nos. 189-191, ECF No. 77.)

7    **C. Plaintiff's Opposition**

8    1. Preliminary Matters

9    Plaintiff's opposition contains four documents.  First, plaintiff filed a document titled

10   "Plaintiff's Statement of Disputed Factual Issues."  (ECF No. 81.)  In this pleading, plaintiff

11   identifies twelve issues to be decided: 1) whether plaintiff received adequate mental health care

12   while housed in the PIP; 2) whether CHCF-PIP or CDCR ever approved its compliance with the

13   Americans with Disabilities Act ("ADA") and ARP;[4] 3) whether it was clear to defendants that

14   they were unable to meet their obligations to provide adequate mental health care services to

15   plaintiff; 4) whether defendants' ineffective system of hiring appropriate staffing led to a staff

16   culture that condoned abuse and retaliation against plaintiff; 5) whether the court-appointed

17   special master's audit team was appointed to monitor CHCF-PIP's implementation of their plan

18   to reform the medical and mental health services, discipline, policies and procedures[5]; 6) whether

19   defendants or CDCR's hiring authorities were in compliance with the remedial order and

20   injunction which incorporates the ADA's anti-discrimination and access provisions[6]; 7) whether

21   defendants were deliberately indifferent to plaintiff's medical and mental health needs from

22   August 27, 2019 through November 26, 2019; 8) whether CHCF-PIP administrator's inability to

23   appropriately staff its facilities created a hazardous and inhumane environment for plaintiff;

24   _____

25   [4]  This Court does not know what "ARP" refers to.
     [5]  Plaintiff's reference to a special master appears to be to the Special Master appointed in the

26   Coleman class action to oversee remediation of the constitutional deficiencies in California's
     prison mental healthcare system.  See Coleman v. Schwarzenegger, 922 F. Supp. 2d 882, 900

27   (E.D. Cal. 2009).
     [6]  Plaintiff's reference to remedial orders appears to be a reference to orders issued in the

28   Coleman class action.

1    9) whether defendants are immune under the ADA and Rehabilitation Act; 10) whether

2    defendants and CHCF-PIP administrators were in contempt of the district court orders based on

3    their failure to appropriately staff the medical and mental health care services; 11) whether

4    defendants provided plaintiff with the obligated broad range of mental health services, as defined

5    in California Code of Regulations title 15, § 3360(2); and 12) whether defendants had appropriate

6    staffing to facilitate or assess the mental health needs of the prison population.  (Id. at 1-3.)

7         As discussed above, the Court ordered that only plaintiff's Eighth Amendment claims

8    raised in the second amended complaint against defendants Kieu, Lundgren and Levin that are

9    based on the claims raised in grievance no. CHCF-HC-20-000548 may proceed.  (See ECF No.

10   49 at 3.)  Therefore, plaintiff's references in his statement of issues to alleged violations of the

11   ADA, the Rehabilitation Act and Title 15, the alleged failure to observe court-ordered remedial

12   orders in the Coleman class action, claims based on allegations not raised in grievance no. CHCF-

13   HC-20-000548, and any legal authority other than the Eighth Amendment, are disregarded.  In

14   addition, plaintiff's reference in his statement of issues to Eighth Amendment claims other than

15   those on which this action proceeds are disregarded.

16        Attached to "Plaintiff's Statement of Disputed Factual Issues" are various exhibits.  (ECF

17   No. 81 at 5-45.)  The Court discusses these exhibits below.

18        Plaintiff's second document filed in support of his opposition is a declaration by plaintiff.

19   (ECF No. 81-1 at 2-6.)  Following plaintiff's declaration is a points and authorities.  (Id. at 7-12.)

20   Plaintiff's third document filed in support of his opposition is a pleading titled, "Brief in

21   Opposition to Defendants' Summary Judgment Motion."  (ECF No. 81-2.)  Plaintiff's fourth

22   document filed in support of his opposition is a pleading titled, "Memorandum of Points and

23   Authorities."  (ECF No. 81-3.)

24            2. Plaintiff's Evidence Attached to Plaintiff's Statement of Disputed Factual Issues

25        Most of the evidence attached to plaintiff's Statement of Disputed Facts is related to

26   events occurring after September 11, 2019.  Plaintiff's evidence regarding events occurring after

27   September 11, 2019 is disregarded because it is not relevant to the claims on which this action

28   proceeds.

28

1        Attached to plaintiff's Statement of Disputed Factual Issues is a document titled

2  "Executive Summary."  (ECF No. 81 at 9.)  This document states that the Office of the Inspector

3  General ("OIG") completed the cycle 5 medical inspection of CHCF in February 2019.  (Id.)  In

4  discussing the timing of the inspection, this document states:

5                The vast majority of our inspection findings were based on CHCF's
                   health care delivery between February 2017 and December 2017.
6                 Our policy compliance inspectors performed an onsite inspection in
                   November 2017.   After reviewing the institution's health care
7                 delivery, our case review performed an onsite inspection in October
                   2018 to follow up on their initial findings.
8  (Id.)

9        The OIG experts "made a considered and measured opinion that the overall quality of

10  health care at CHCF was inadequate."  (Id.)  A page from this report states, "We do not

11  reasonably expect a severely understaffed institution to provide adequate care."  (Id. at 44.)

12        In his declaration submitted in support of the opposition, plaintiff makes statements that

13  generally restate the allegations in the second amended complaint.  (ECF No. 81-1 at 3-6.)

14    **D.  Analysis**

15        1.  <u>Claim Alleging Denial of Access to Mental Health Services Due to Staff</u>

16           <u>Shortages, etc. between August 27, 2019 and September 11, 2019</u>

17        As discussed above, in the summary judgment motion, defendants acknowledge plaintiff's

18  claim alleging that plaintiff was denied the ability to participate in a broad range of mental health

19  services due to staff shortages, overcrowding and an increase in violence.  In the section of the

20  summary judgment motion addressing the merits of plaintiff's claims, defendants do not directly

21  address this claim.  However, defendants argue that plaintiff had access to adequate mental health

22  care.  Defendants' undisputed evidence demonstrates that during the relevant time period,

23  plaintiff was on one-on-one status, so plaintiff was not permitted to attend group therapy because

24  he could not commit to personal safety.  (Defendants' undisputed facts nos. 70, 71, 198, 199.)

25  Defendants' undisputed evidence demonstrates that during the relevant time period, plaintiff met

26  weekly with the IDTT.  (Defendants' undisputed fact no. 28.)  Defendants' undisputed evidence

27  demonstrates that during the relevant time period, plaintiff was non-compliant with his

28  psychotropic medication regimen.  (Defendant undisputed facts nos. 49, 61, 69.)  Defendants'

1    undisputed evidence demonstrates that during the relevant time period, plaintiff was offered in-

2    cell coping materials.  (Defendants' undisputed Fact No. 201.)  Defendants' undisputed evidence

3    also indicates that during the relevant time period, plaintiff had access to individual therapy.

4    (Defendants' undisputed fact no. 69.)

5          In the opposition, plaintiff presents evidence that CHCF was understaffed in 2017.

6    However, plaintiff presents no evidence demonstrating that plaintiff was denied access to mental

7    health treatment between August 27, 2019 and September 11, 2019 due to understaffing,

8    overcrowding or an increase in violence, as alleged in the second amended complaint.  Plaintiff

9    also fails to identify any specific mental health treatment he failed to receive between August 27,

10    2019 and September 11, 2019 due to understaffing, overcrowding or an increase in violence.

11          Based on the undisputed evidence discussed above, this Court finds that there is no

12    evidence supporting plaintiff's claim that plaintiff was denied access to mental health treatment

13    between August 27, 2019 and September 11, 2019 due to understaffing, overcrowding or an

14    increase in violence.  Accordingly, defendants should be granted summary judgment as to this

15    claim.

16                  2.  <u>Claims Against Defendant Kieu Only</u>

17          In the second amended complaint, plaintiff alleges that from August 27, 2019 through

18    September 11, 2019, defendant Kieu confined plaintiff in his cell without any set treatment plan.

19    This Court finds that defendants' undisputed evidence demonstrates that defendant Kieu prepared

20    a set treatment plan for plaintiff, with clear goals and expectations, two days after plaintiff arrived

21    in the CHCF PIP.  Defendants' undisputed evidence also demonstrates that plaintiff's treatment

22    plan was regularly updated after each weekly IDTT.  (<u>See</u> Undisputed Facts Nos. 28, 50-51, 57-

23    59, 70.)

24          Although defendants did not directly address plaintiff's claim that he was confined in his

25    cell from August 27, 2019 through September 11, 2019, defendants' statement of undisputed facts

26    contains evidence regarding this claim.  Defendants presented undisputed evidence demonstrating

27    that plaintiff could not attend group therapy from August 27, 2019 until on or around September

28    17, 2019 due to plaintiff's self-injurious behaviors and because plaintiff persistently expressed

suicidal ideation.  (See undisputed fact no. 138.)

While defendants argue that plaintiff was confined to his cell during one-on-one observation, this argument is not supported by the evidence.  While plaintiff was not allowed to attend group therapy while on one-on-one observation due to plaintiff's failure to commit to his own personal safety, defendants' evidence demonstrates that plaintiff was allowed to leave his cell during one-on-one observation when plaintiff was supervised by CHCF staff.  For example, defendants' evidence demonstrates that plaintiff left his cell to attend weekly IDTT meetings while he was on one-on-one observation.  Defendants also presented evidence that plaintiff attended confidential meetings with defendant Kieu, presumably outside of plaintiff's cell, while plaintiff was on one-on-one observation.  (See undisputed facts nos. 63, 69.)  While the extent to which plaintiff left his cell while on one-on-one observation is not clear, the undisputed evidence demonstrates that plaintiff was not entirely confined to his cell from August 27, 2019 to September 11, 2019.

In his opposition, plaintiff presents no evidence supporting his claims that he was confined to his cell from August 27, 2019 through September 11, 2019 and that defendant Kieu failed to develop a treatment plan for plaintiff.  As discussed above, defendants' undisputed evidence demonstrates that defendant Kieu developed a treatment plan.  Defendants' undisputed evidence also demonstrates that the extent of plaintiff's confinement to his cell between August 27, 2019 and September 11, 2019 was based on plaintiff's mental health needs, which does not amount to deliberate indifference.  For these reasons, defendant Kieu should be granted summary judgment as to these claims.

### 3. Claims Against Defendant Levin Only

In the second amended complaint, plaintiff alleges that from August 28, 2019 through September 11, 2019, during each of plaintiff's IDTT sessions, defendant Levin told plaintiff that it was not her job to run therapeutic groups when plaintiff asked for such services.  In this claim, plaintiff appears to allege that defendant Levin violated the Eighth Amendment by denying plaintiff's requests to attend therapeutic groups between August 28, 2019 and September 11, 2019.  This Court finds that defendant Levin did not act with deliberate indifference when she

31

1    allegedly denied these requests because it is undisputed that plaintiff was not permitted to attend

2    group therapy during that time because plaintiff was on one-on-one status based on plaintiff's

3    inability to commit to his personal safety.  For this reason, defendant Levin should be granted

4    summary judgment as to this claim.

5                            4. Claims Against Defendant Lundgren Only

6            In the second amended complaint, plaintiff alleges that defendant Lundgren refused to

7    remove plaintiff from his cell on September 11, 2019 so that plaintiff could write letters.

8    Although defendants do not directly address this claim, defendants' statement of undisputed facts

9    contains evidence regarding this claim.  This Court observes that on September 11, 2019,

10   defendant Lundgren checked on plaintiff and the availability of in-cell coping materials.  (See

11   undisputed fact no. 155.)  In her declaration, defendant Lundgren states that during the September

12   11, 2019 cell-side check, plaintiff told her that he wanted to come out of his cell for group

13   therapy. (ECF No. 77-5 at 4.)  As discussed above, plaintiff was not permitted to attend group

14   therapy on September 11, 2019 because plaintiff was on one-on-one status.  Therefore, to the

15   extent plaintiff claims that defendant Lundgren refused to remove plaintiff from his cell to attend

16   group therapy on September 11, 2019, this claim is without merit because plaintiff was not

17   allowed to attend group therapy at that time.

18           This Court observes that in the second amended complaint, plaintiff alleges that on

19   September 11, 2019, defendant Lundgren denied plaintiff's request to leave his cell to write

20   letters.  Defendants provided a record by defendant Lundgren stating that she met with plaintiff

21   cell-side on September 12, 2019.  (ECF No. 77-5 at 210.)  Defendant Lundgren wrote, "Pt.

22   presented as argumentative and entitled requesting to come out of his cell to write letters with this

23   writer.  This writer instructed pt if he needs help writing, pt's 1:1 or floor staff are available to

24   help him." (Id.)  While defendant Lundgren may have denied plaintiff's request to leave his cell

25   to write letters on September 12, 2019, there is no record that defendant Lundgren denied a

26   request made by plaintiff on September 11, 2019 to leave his cell to write letters.

27           Plaintiff offers no evidence supporting his claim that defendant Lundgren violated the

28   Eighth Amendment by denying his request to leave his cell on September 11, 2019.  Accordingly,

1   defendant Lundgren is entitled to summary judgment as to this claim.

2           5. Qualified Immunity

3           Defendants argue they are entitled to qualified immunity.  (Defs. MSJ at 23-25, ECF No.

4   77.)

5                   a. Legal Standards

6           "The doctrine of qualified immunity protects government officials 'from liability for civil

7   damages insofar as their conduct does not violate clearly established statutory or constitutional

8   rights of which a reasonable person would have known.'"  Pearson v. Callahan, 555 U.S. 223,

9   231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity

10  shields an officer from liability even if his or her action resulted from "a mistake of law, a

11  mistake of fact, or a mistake based on mixed questions of law and fact."  Id. (internal quotation

12  marks and citation omitted).

13          "Determining whether officials are owed qualified immunity involves two inquiries:

14  (1) whether, taken in the light most favorable to the party asserting the injury, the facts alleged

15  show the official's conduct violated a constitutional right; and (2) if so, whether the right was

16  clearly established in light of the specific context of the case."  Robinson v. York, 566 F.3d 817,

17  821 (9th Cir. 2009) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)).  A right is "clearly

18  established" when, "at the time of the challenged conduct, '[t]he contours of [a] right [are]

19  sufficiently clear' that 'every reasonable official would [have understood] that what he is doing

20  violates that right.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (quoting Anderson v.

21  Creighton, 483 U.S. 635, 640 (1987)).

22                  b. Analysis

23          Defendants move for qualified immunity on the grounds that the undisputed facts

24  demonstrate they did not violate plaintiff's Eighth Amendment rights and because it would not

25  have been clear to a reasonable official in defendants' positions that their treatment of plaintiff

26  violated clearly established law.  "Because the Court has found that there is no genuine issue of

27  material fact to support plaintiff's claims, 'there is no necessity for further inquiries concerning

28  qualified immunity.'"  Los Angeles Cnty. v. Rettele, 550 U.S. 609, 616 (2007) (quoting Saucier,

33

1  533 U.S. at 201).  Thus, the Court declines to address the issue of qualified immunity .

2  **E.  Discussion Regarding  Claim for Ongoing Violations**

3  As discussed above, this action proceeds on plaintiff's claim alleging denial of access to

4  mental health treatment between August 27, 2019 and September 11, 2019 due to understaffing,

5  overcrowding and an increase in violence, which was administratively exhausted in grievance no.

6  CHCF-HC-20-000548.  As discussed above, defendants' undisputed evidence demonstrates that

7  plaintiff was denied access to group therapy prior to his release from one-on-one status because

8  plaintiff could not commit to his personal safety.  In the opposition, plaintiff presents evidence

9  demonstrating that he may have been denied access to group therapy on occasion due to

10  understaffing after his release from one-on-one status on or around September 17, 2019.  (ECF

11  No. 81 at 15, 17, 25, 26.)  In Sheltra v. Christensen, 2024 WL 5250273, *7 (9th Cir. Dec. 31,

12  2024), the Ninth Circuit recently held that under the continuing-violations doctrine, a properly

13  exhausted prison grievance asserting "one, continuing harm or a single course of conduct" can

14  exhaust events arising out of the same alleged violation that occur after the grievance was made.

15  Assuming the holding of Sheltra v. Christensen applies to pending actions, this Court finds that

16  grievance no. CHCF-HC-000548 did not administratively exhaust plaintiff's claim alleging denial

17  of access to group therapy due to understaffing after plaintiff's release from one-on-one status.

18  Because plaintiff was allegedly denied access to group therapy for different reasons before and

19  after his release from one-on-one status, grievance no. CHCF-HC-000548 did not

20  administratively exhaust plaintiff's claim alleging denial of access to group therapy due to

21  understaffing after plaintiff's release from one-on-one status.

22  **VII. REMAINING MATTERS**

23  **A. Plaintiff's Motion for Appointment of Counsel**

24  District courts lack authority to require counsel to represent indigent prisoners in section

25  1983 cases.  Mallard v. United States Dist. Court, 490 U.S. 296, 298 (1989).  In exceptional

26  circumstances, the court may request an attorney to voluntarily represent such a plaintiff.  See

27  28 U.S.C. § 1915(e)(1); Terrell v. Brewer, 935 F.2d 1015, 1017 (9th Cir. 1991); Wood v.

28  Housewright, 900 F.2d 1332, 1335-36 (9th Cir. 1990).  When determining whether "exceptional

1   circumstances" exist, the court must consider plaintiff's likelihood of success on the merits as

2   well as the ability of the plaintiff to articulate his claims pro se in light of the complexity of the

3   legal issues involved.  Palmer v. Valdez, 560 F.3d 965, 970 (9th Cir. 2009) (district court did not

4   abuse discretion in declining to appoint counsel).  The burden of demonstrating exceptional

5   circumstances is on the plaintiff.  Id.  Circumstances common to most prisoners, such as lack of

6   legal education and limited law library access, do not establish exceptional circumstances that

7   warrant a request for voluntary assistance of counsel.

8       Because this Court recommends that defendants' summary judgment motion be granted,

9   plaintiff's motion for appointment of counsel (ECF No. 79) is denied.

10      **B. Defendants' Motion to Strike Plaintiff's Sur-Reply**

11      Following the filing of defendants' reply to plaintiff's summary judgment opposition, on

12   June 6, 2024 plaintiff filed a pleading titled "Plaintiff's Declaration in Reply of Defendants'

13   Motion for Summary Judgment."  (ECF No. 86.)  On June 13, 2024, defendants filed a motion to

14   strike plaintiff's pleading filed June 6, 2024 as an impermissible sur-reply.  (ECF No. 87.)

15      The Local Rules provide for a motion, an opposition, and a reply.  See E.D. Cal. L.R.

16   230(l). There is nothing in the Local Rules or the Federal Rules that provides the right to file a

17   sur-reply. The court generally views motions for leave to file a sur-reply with disfavor.  See Hill

18   v. England, 2005 WL 3031136, at *1 (E.D. Cal. Nov. 8, 2005) (citation omitted).  However,

19   district courts have the discretion to either permit or preclude a sur-reply.  See JG v. Douglas

20   County School Dist., 552 F.3d 786, 803 n.14 (9th Cir. 2008) (district court did not abuse

21   discretion in denying leave to file a sur-reply where it did not consider new evidence in reply).

22      Plaintiff did not seek leave to file a sur-reply.  In addition, plaintiff failed to file an

23   opposition to defendants' motion to strike addressing why he should be granted leave to file a sur-

24   reply.  This Court finds no good cause to permit plaintiff to file the sur-reply.  In addition,

25   permitting plaintiff to file the sur-reply would require granting defendants leave to respond to the

26   sur-reply, further delaying resolution of defendants' summary judgment motion.  For these

27   / / / /

28   / / / /

reasons, defendants' motion to strike plaintiff's sur-reply is granted.[7]

## VIII.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED that:

1.  Plaintiff's motion for appointment of counsel (ECF No. 79) is denied; and

2.  Defendants' motion to strike plaintiff's sur-reply (ECF No. 87) is granted.

IT IS HEREBY RECOMMENDED that defendants' summary judgment motion (ECF No. 77) be granted.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  January 15, 2025

CHI SOO KIM
UNITED STATES MAGISTRATE JUDGE

Ardds133.57
2

---

[7]  Plaintiff's sur-reply consists of legal argument and contains no new evidence.  (ECF No. 86.)

36